Section 19 does not force banks like Wells Fargo to refuse to give employees pre-screening notice of how they can go and get their own waivers without sponsorship. And in the case of Williams, Section 19 does not force banks to summarily terminate individuals. Richard Eggers was not summarily terminated. Wells Fargo had discretion in how it went about complying with Section 19. But what they've done here, and the error that Wells Fargo convinced the lower court to buy into, was glossing over the two specific practices that Eggers identified. And instead, implementing a straw man practice. Wells Fargo wants this court to believe, convince the lower court that the practice being analyzed here is the practice, the broad over-generalized practice of just Section 19 compliance. We are not challenging Section 19 compliance here. We understand that banks are subject to possible penalties and fines if they don't comply with Section 19. But we also know that the FDIC in Section 19 permits banks like Wells Fargo to sponsor waivers in order to avoid those fines and penalties. To give employees notice of how they can go and get their own waivers in order to avoid fines and penalties. In essence, the over-broad generalization would be analogous to this. Consider if, for example, in Griggs, there was an argument that instead of the practice being not hiring people with high school diplomas, that instead the practice identified was hiring skilled employees. Summary judgment wasn't granted in Griggs because the practice wasn't hiring skilled employees. Of course, if that was the practice, then the employer would say, well, in hiring skilled employees, it was reasonable for us to require everyone to have a high school diploma. That's not the specific practice in Griggs. Now, Griggs is a business necessity case. This is an ADEA case. What we're dealing with here is an analysis of whether or not Wells Fargo had a reasonable factor other than age. What's Mr. Eggers' injury? Mr. Eggers was terminated as a result of not being sponsored and not being given advance notice. Had he been sponsored, Richard Eggers would not have, there was about a three month period of time between when Wells Fargo placed Richard Eggers on leave. And it took him about three months in order to get his waiver. He eventually did get one, right? He eventually did, which makes perfect sense. His crime was a 1963 fraud conviction, I'm sorry, for having a cardboard dime in a laundromat and trying to use it in 1963. It was patently obvious that Richard Eggers would receive a waiver. But with that being said, there's also evidence in the record of a woman named Tammy Burnham. She's an example of a Wells Fargo employee- Did he get his job back, Mr. Eggers? Did he continue to work for Wells Fargo? Wells Fargo did offer Richard Eggers his job back. He refused because he specifically asked Wells Fargo, if you give me my job back, please give everyone else that you just fired this year in 2012 the opportunity to get their jobs back as well. Wells Fargo refused, and Richard Eggers decided that he did not want to work for a company that engaged in practices that were not reasonable, that were not business necessities. And that resulted in impact against not just older workers, but also minorities. I was talking about Tammy Burnham. Tammy Burnham received notice before Wells Fargo ever screened her for Section 19 compliance. Tammy Burnham was actually the same employee who summarily terminated many of the Williams plaintiffs. She was the same Wells Fargo employee who was responsible for Richard Eggers and what happened to him being offered, not summarily terminated, but being placed on leave. She had a Section 19 crime. Wells Fargo never gave her notice of her opportunity to go and get her own waiver before it ever screened her for Section 19 compliance. And prior to Wells Fargo screening Tammy Burnham, she received a waiver from the FDIC. In the record, there's 403 waivers. One of those waivers is a waiver from Tammy Burnham, and she received it. That goes to the heart of this case and why reversal needs to be done here. Wells Fargo has put forth no reasonable factor for not sponsoring anyone's waivers. And Wells Fargo has not put forth any reasonable, carried its burden of both production and persuasion to say, why is it reasonable not to give employees advanced pre-screening notice? So that they have an opportunity to continue working for Wells Fargo. What's the evidence that those practices would ameliorate and affect an alleged disparate impact on older workers? There's three. Right now the evidence is not developed because we were only in the collective action certification stage. So we haven't done merits development yet. But when that question was asked on Wells Fargo's motion to dismiss, there's three rationales that will result in, once merits discovery is done, it'll show a statistical impact against older workers. One- This particular case, the Eggers case, is a class action? Not yet. It is a putative collective action. Mr. Eggers is the representative for that? He is. His estate is. Yes. Older workers are more likely- Did this case get dismissed on a motion for summary judgment or a motion to dismiss? On a motion for summary judgment, it was dismissed. If you look at- So you weren't required to put on any evidence at that point of a disparate impact? You were going to do that in the future? Correct. We were not. Because if you look at Wells Fargo's motion, turn to the record at pages nine through ten. Wells Fargo lists, Wells Fargo identifies the reasons it's moving for summary judgment. It provides a list of six reasons. None of those reasons allege that there's no genuine dispute as to whether or not there's a disproportionality against older workers. Rather, those six reasons in Wells Fargo's summary judgment briefing all kind of went to the issue of whether or not section 19 in and of itself was a complete defense. We read Wells Fargo's summary judgment briefing very carefully. And we came up with all of the genuine disputes that showed that section 19, of course, is not a complete defense. The issue is not before this court as to whether or not statistical disproportionality has been shown as part of a plaintiff's prima facie case. That is an issue that Wells Fargo can bring at the appropriate time once Richard Eggers has access to merits discovery. That time has not come. This summary judgment was filed prior to merits discovery, which was bifurcated. Instead, it was filed during class certification discovery. Did you ask for more time for discovery under Rule 56? I mean, a motion for summary judgment is a motion for judgment on the merits. So if you're saying you didn't have enough discovery to respond to the motion, then presumably you could have so responded to the motion under Rule 56 and you know the section that says- I agree, Your Honor, and we did that. We did ask for 56D information. However, the 56D information we asked for was not to fully develop the statistical record. It was to fully develop the specific issues that Wells Fargo identified in its Rule 56 motion. I think it's telling that as you read the lower court's order, there's no talk about statistics. The lower court does not dismiss either the Williams case or the Eggers case because the statistics are bad for some reason. Rather, the lower court is concerned with the issue that Wells Fargo raised in its briefing. Is section 19 in and of itself somehow a complete defense? That's what our briefing was centered on in Eggers. We had not even gotten to the point of hiring an expert to analyze the statistics. The statistical basis is for why there's disparate impact. There's three of them. One is that older workers are more likely to have a crime at some point in their life, a section 19 related offense. The second is that older workers are more likely to obtain waivers, because the distance between the date of their last conviction, on average is longer, younger people are more likely to commit crimes. That's accepted social science. And the last reason is telling. Eggers' crime was, again, he was 19 in 1963. He was fooling around with a cardboard dime in a laundromat in Carlisle, Iowa. That type of behavior in today's day and age does not result in convictions. And there's other types of crimes that we used to handle in significantly different ways. Bad checks, for example, were driven by criminal law mostly, but as time has progressed, they've been handled in more civil contexts. A lot of the Williams plaintiffs were convicted of bad checks in the 80s and 90s. Those type of convictions have gone down over time, even though bad checks are still being written. They're not criminal offenses. You're making a case to go to Congress, but not so much for court relief. The court relief I'm asking for stems 100% from the application of the specific practices to the ADEA. Is the practices refusing to sponsor waivers? The question is, was there a reasonable factor other than age for Wells Fargo to refuse to sponsor Richard Eggers' waiver or the waivers of anyone else? Wells Fargo has not put forth a reason. They have a burden of both production and persuasion under Meacham that has not been carried in the record and was not addressed at all by the district court. I'll reserve the rest of my time for- Did you say that Wells Fargo offered Eggers a job and he declined it, or offered to retain him and he declined? After he, Wells Fargo did not summarily fire Richard Eggers. They said, Richard, we see that you have a section 19 offense. We are going to place you on leave. We're going to give you up to six months to get your own waiver. Richard got it in about three months. Wells Fargo offered his job back, but Richard Eggers declined because Wells Fargo refused to stop its policy that was disparately impacting older workers. But why is he injured then? Why is Eggers himself a proper plaintiff? He's injured because the evidence shows that sponsorship, sponsored waivers are processed faster than individual waivers. And two, the evidence shows that if you're given advance notice, there's a possibility that you're not fired in the first place. Eggers, under the notice one- But he wasn't fired. You just said he was not fired. He was placed on unpaid leave. Unpaid leave is an adverse employment action. Unpaid leave. You're saying his injury was that they gave him unpaid leave so that he could apply for the waiver. Yes, three months of unpaid leave. And what do you say they should have done? Given unpaid leave or? Paid leave, if you turn to page 20 of the addendum, you can see that the FDIC does authorize paid leave as a discretionary practice that banks can engage in. But rather than that, even, that's sponsorship though. The advanced notice, that would have resulted in Richard Eggers potentially not being on leave at all. Being able to keep his employment, just like Tammy Burnham, in the record before the court. I'd like to reserve some time for rebuttal. Thank you, Mr. Bates. Mr. Giudice, excuse me, Mr. Giadesi. It's Giudicesi. Giudicesi. Thank you, may it please the court. I'll probably get it tomorrow. Please forgive me. Thank you, and may it please the court. I'm sensitive to mispronounced names. He's got a tough name to pronounce. He gets that a lot. Smith. But I know from my old journalism days that Smith can be spelled many ways. So again, may it please the court, Michael Giudicesi and Susan Elgin on behalf of Wells Fargo Bank. I don't normally on an appeal start out by trying to correct the record, but Mr. Bates misstated the record in so many different ways that it's hard, I think, to go forward with this argument without correcting some of the things. First of all, Richard Eggers was not placed on leave. Richard Eggers was brought in, and when he was advised, I think it was around the 17th of July of 2012, that he was ineligible to continue as an employee at Wells Fargo. And in a single instance, Wells Fargo offered him the ability to take unpaid leave. He declined, said he would prefer to get unemployment. He was discharged. So like all 360 other team members who went through the screen at Wells Fargo home mortgage, Richard Eggers had the same impact to him, he was fired. And he thereafter went to the FDIC on his own. He received a waiver from the FDIC, came back to his lawyer, sent that waiver to Wells Fargo. Wells Fargo offered to reinstate him, and it was at that point that Mr. Eggers, excuse me, said that he didn't want to come back. And if you look at Wells Fargo appendix page 79, you'll see the press release put out by Mr. Eggers' lawyer detailing all of the reasons why he was not going to come back and go to work at a place like Wells Fargo who would not offer everyone else the ability to come back like they'd offered him after he obtained his waiver. If you also look at Wells Fargo appendix page 79, there's not a single reference to age discrimination. It talks about being a whistleblower, it talks about Wells Fargo unfairly terminating lower level employees. It doesn't talk about age discrimination. And this is an age discrimination case. It's an age discrimination case that requires that Mr. Eggers, to continue his case past a dispositive motion on summary judgment, show that there was an impact on him because of his age. I am aware of no empirical studies. I'm aware of nothing in the literature that says there are headwinds for older people, and headwinds that prevent them from keeping their jobs because of prior criminal convictions. Judge Colleton, you asked about whether this was a dispositive motion, summary judgment, and Judge Smith, you asked whether it was an individual that was proceeding in a collective action. At the point of summary judgment, it was a single plaintiff case. Richard Eggers was the only plaintiff. There had been no opt-ins by anyone else, there had been no notices by anyone else, and there had been no preliminary certification of a collective action. So a single plaintiff case, number one. Number two, with respect to the idea that there was no evidence that they needed to come forward with or no discovery. The case had been pending since, I think it was 2014, and the motion was in 2016, and then they asked for a 56D motion. They received extensions, they did extensive discovery, received information on the merits, and still, when they resisted the summary judgment, they could come forward with no evidence showing a disparate impact. A prima facie case of disparate impact. Well, he says you just argued section 19, and you didn't argue anything that would require the kind of statistical. It's in the appendix. Well, if you look at the appendix- And Judge Woolley didn't rely on any statistical evidence either. He argued that- Well, Judge Woolley said that there was not a case, and what he said was there wasn't even a haystack in which to look for a needle. So, I believe it's a tale of the record. I believe it's Wells Fargo Appendix 230. It's the briefing that we've filed on summary judgment. And it says at pages 20 to 22, plaintiff rests his age disparate impact case on generalities about who is more likely to engage in crime between undefined groups of younger and older persons. And it goes on to talk about the prima facie disparate impact case that's needed to survive summary judgment. The issue was fully joined, and they have no evidence anywhere in the record to indicate that there is a disparate impact on people who are over 40 because of criminal convictions. Even if you look at the EEOC's guidance on it, the EEOC's guidance on the use of criminal convictions talks about individuals who are protected class members of race. It never talks about age. It's a Title VII declarative, not a ADEA declarative. And it defies logic to say because you live longer, you're more likely to have committed a crime. And it further defies logic to say that you're more likely to commit a crime of breach of trust, dishonesty, or money laundering. One of the problems that we face in this case and in the earlier case that you considered is that this circuit's decision in Green versus Missouri Pacific is being read extremely broadly. And that case said, it was a split decision, but Judge Bright wrote that a employer policy of barring anyone from working because of a conviction was too broad. And what we would hope this court would do is take a look at that case and say, well, what did we, the Eighth Circuit, ask employers to do? We said, the court said, narrow what you use criminal convictions for, make them job related. What's the job relation here? It is crimes of breach of trust, dishonesty, and money laundering. These are for individuals who are working in federally insured depository institutions. So the crime is tied to the job. That's one thing that Green said. Green also said, we'll make it a temporal issue. Look at how the close proximity is of the crime, the conviction, to the job in the time of offer or review. Wells Fargo doesn't have that luxury here. Section 19 has no statute of limitations. Unlike other provisions that affect banks, there may be a ten year limit or things like that. There's nothing in section 19. Do you have a conviction for breach of trust, dishonesty, or money laundering? If you do, ab initio, you cannot work for a FDIC insured institution. So the second piece of Green was honored. What isn't clear from Green is that, or this case stretches it. In Green it said it had to be an employer policy. And to go back to the argument that was presented to you in the Williams case. This is not an employer policy. This is an act of Congress. An act of Congress has said, we don't want people with these types of convictions working in our banks, unless the agency that's insuring the deposits of Americans has first given its consent. Well, again, their argument isn't about section 19, though it is about your policy of how you implement section 19. Well, there is no policy of how they implement it. Look in the record. You could have a policy that says, before we terminate anybody for section 19, we're going to give them notice. There's not that policy. You could have that policy. We could, but again, if you go to the Malin case, Judge Hanson said that there is no requirement of notice. And that the criminal defendant has had the most exhaustive methods of information. I mean, we argued, again, this is what we argued to Judge Wooley, and I think it resonated with him, it resonates with here. Look who didn't give notice. A presiding judge didn't give notice that you might be disqualified. The lawyers involved didn't give notice. All of the federal government didn't give notice. The probation officer didn't give notice. And so you're going to come to the end of the chain and say, well, you know who has to give notice? The employer has to give notice. There's nothing in the law- Well, the employer's the one who's taking the adverse action. Those other actors didn't terminate the employment. There's no adverse action here. These individuals were, they were ineligible from the point of conviction forward. That's what happened. They had jobs that mistakenly, by Wells Fargo, mistakenly by them. Did they fill out applications fraudulently? Richard Eggers, on his application, said, have you been convicted of a crime of breach of trust, dishonesty, or money laundering, and he said no. So he didn't accurately reflect on his job application what his status was under Section 19. Now, it didn't say, are you Section 19 eligible? It simply asked if you had that type of conviction. He didn't answer that right. Well, anyway, even if they'd all answered truthfully, the employer would have taken an adverse action by refusing to hire them. Correct. Correct. If it was done. Now, the record would show some people were hired because there were mistakes done in the background searches because prior to 2010, fingerprint based searches weren't available on a universal basis. They became available after federal reforms. But again, it's the other part about that, Judge Collin, again, I go back to the idea. This is an age case, and unlike Title VII, where Words Cove would say, if you show a prima facie case that the practice you're alleging disparately impacts a protected class, and there's no business necessity, you can then get to alternatives. In the ADEA, alternatives aren't an issue. They never are an issue. There is not a provision of the ADEA, or there's not case law under the ADEA that says we look at alternatives. We simply look at, is there a reasonable factor other than age that motivated the employer's action? And, I'm sorry to repeat an argument you've heard within the last 60 minutes. But in Malin, the FDIC sought an injunction. Judge Hanson, for the Northern District at the time, he said the FDIC did not need to show irreparable harm. Because section 19 on its face indicated public policy and the need for an injunction. If section 19 provides irrefutable evidence on its face of irreparable harm, we likewise think that it is reasonable. In fact, it is probably, we would urge mandatory to conclude that section 19 provides a reasonable factor other than age. And I take you to one last case, US versus Myers. That's a case, I think, Judge Murphy, you were on the panel for the Meyer case. It was a case where an individual came to the district court and a magistrate judge entered an order expunging the individual's record. So that he might not be disqualified from working at a federally insured depository institution. And that was reversed at this court. The court said that it would not allow the magistrate judge, and in fact it found lack of subject matter jurisdiction for the expungement. That's not why we cite the case. We cite the case for the concepts that in there, the court said how important it was to have this information. And how important it is to have section 19 compliance. Well, if it's so important to have section 19 information and more records, it is equally important as a reasonable factor other than age. So what we believe is that section 19 is, as a matter of law, the reasonable factor other than age, thereby ending the inquiry. There is no alternatives to look at under the ADEA. So in sum, the reasonable factor other than age, the Malin case, the lack of proof of disparate impact at a prima facie level, all show why the district court correctly entered summary judgment. And you can quarrel with the concise opinion of Judge Woolley. But the district court, in looking at it, on reflection, when I went back to read the district court's order, he was very precise and he would pinpoint in how he looked at what the claims were and how he rejected them. And throughout the case, the issue has always been, is section 19 a defense to these terminations? The EOC has said it is. Other cases that we've cited in our brief at district courts have said it is. The district court in this case said it is. And we urge you to find so here. We ask that you affirm. Thank you. Thank you, Mr. Giudicessi. Mr. Bates, your rebuttal. The fundamental flaw with Wells Fargo's argument that you just heard came when Wells Fargo argued, and I quote, section 19 in and of itself is an RFOA. That is not, that is not material. And that does not carry the burden of production and persuasion that Wells Fargo has to carry to get summary judgment. Because the practice identified here, in and of itself, is not simply section 19 compliance. We have identified a specific practice, just as Smith and Meacham require the plaintiff to do. And we have identified Wells Fargo's longstanding policy of refusing to sponsor anyone's waiver and refusing to give anyone notice before their screenings of how they can get their own waivers. In the record, on page 71, you will find a key admission that should result in reversal. When that admission comes from the executive sponsor of Wells Fargo's background check efforts, Pete Delanoid. And he states, and I quote, sponsoring section 19 applications for its employees was a reasonable way of complying with section 19. We are here asking for reversal. What page do you want us to look at for that? Page 71 of the record. The quote is reasonable way of- What do you mean by the record? I apologize, of plaintiff's appendix. Okay, thank you. So, in short, we understand why the court would grant summary judgment if we made a grave mistake and broadly identified the practice being challenged here as section 19 compliance. We did not do so. We were much more specific. If we apply the standards in Smith and Meacham, and there's an analysis done of the actual practices that the plaintiffs identified, then the conclusion will be that the summary judgment must be reversed. Thank you for your time, your honors. Thank you, Mr. Bates. Court, thanks, and thanks both counsel for your argument this morning, the briefing you've submitted to us. We'll take the case under advisement and render decision in due course.